IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JULIE TORBETT THOMAS,<br><br>    Plaintiff,<br><br>v.<br><br>EAST CAROLINA UNIVERSITY, a constituent institution of the University of North Carolina; and THE UNIVERSITY OF NORTH CAROLINA,<br><br>    Defendants. | Case No. _____ |

**COMPLAINT AND JURY DEMAND**

**COMES NOW**, the Plaintiff, Julie Torbett Thomas, by and through the undersigned counsel, and for her cause of action states the following:

**Introduction**

1. Plaintiff Julie Torbett Thomas ("Coach Torbett") brings this employment discrimination and retaliation action against East Carolina University ("ECU") and the University of North Carolina ("UNC") to seek redress of ECU's violations of her rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (1982) (hereinafter "Title IX").

2. Title IX prohibits covered employers from retaliating against employees who raise Title IX concerns.

3. Title IX protects employees from gender-based discrimination in the terms and conditions of their employment. 20 U.S.C. § 1681; 34 C.F.R. part 106, Subpart E.

1

4. Coach Torbett was a successful volleyball coach, having coached for approximately 25 years at the collegiate level at the time ECU fired her.

5. Coach Torbett reported concerns about ECU's Title IX violations, which include ECU's inequitable treatment of female student athletes relative to male athletes and gender-based discrimination toward female coaches.

6. In retaliation, ECU mounted a campaign to investigate Coach Torbett, sow discontent among her athletes, and ultimately fire her.

## Jurisdiction and Venue

7. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

8. Venue is proper in the United States District Court for Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in Greenville, North Carolina, which is within the jurisdiction of this Court.

## Parties

9. Plaintiff Julie Torbett, a female, is a current resident of Chattanooga, Tennessee.

10. Defendant East Carolina University is an institution of higher education receiving federal financial assistance and located in Greenville, Pitt County, North Carolina.

11. ECU is a constituent institution of Defendant The University of North Carolina ("UNC").

12. Defendant UNC is a body politic and corporation authorized and existing under the authority of N.C.G.S. § 116-3 and the laws of the State of North Carolina, which body is capable under the law of being sued in this Court, and said board being charged under N.C.G.S. § 116-11 with the responsibility for the general determination, control, supervision, management, and governance of all the affairs of its constituent universities, include Defendant ECU.

## Title IX's Requirements

13. Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance. These prohibitions apply both to claims of sex discrimination in student athletic opportunities and to claims of sex discrimination in employment.

14. Title IX contains three areas of compliance related to student athletic opportunities: (1) effective accommodation of student interests and abilities; (2) equal athletic financial assistance; and (3) equal treatment and benefits for athletic teams.

15. ECU historically, including at the time Coach Torbett was fired, has failed all three areas of compliance.

16. For instance, data reported by ECU under the Equity in Athletics Disclosure Act shows significant participation gaps in the last four years for which data is currently available.

17. For the 2016–2017 academic year, females made up 56.4% of ECU's total undergraduate student body and yet represented only 46.3% of the student athletes. This 11.1% gap equated to 138 female athletic participation opportunities that would have needed to be added in order for females to receive equitable participation opportunities.

18. For the 2017–2018 academic year, the gap was 6.1%, requiring an additional 81 participation opportunities. The gap was the same for the 2018–2019 academic year.

19. For the 2018–2019 academic year, the gap was 5.46%, representing a gap of 69 participation opportunities.

20. EADA data likewise shows that between the 2016–2017 and 2018–2019 academic years, ECU female athletes received approximately $350,000 less financial aid per year than they would have received had they been given equitable participation opportunities.

3

21. For the final area of Title IX compliance—treatment and benefits—Title IX requires equal athletic opportunities in the following, non-exhaustive areas:

   a. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
   b. The provision of equipment and supplies;
   c. Scheduling of games and practice time;
   d. Travel and per diem allowance;
   e. Opportunity to receive coaching and academic tutoring;
   f. Assignment and compensation of coaches and tutors;
   g. Provision of locker rooms, practice, and competitive facilities;
   h. Provision of medical and training services;
   i. Provision of housing and dining facilities and services;
   j. Publicity; and
   k. Recruiting and other support services.

22. Title IX's prohibition of sex discrimination also applies to the employment of those employed "under any education program or activity receiving Federal financial assistance[.] 20 U.S.C. § 1681.

23. Title IX regulations specific to employees were promulgated by Congress. *See* 34 C.F.R. part 106, Subpart E. *See also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 512 (1982) (nothing that "subpart E regulations promulgated in connection with Title IX are valid").

24. The U.S. Department of Education also adopted guidance interpreting Title IX to cover and protect employees of educational institutions. *See* Title IX Resource Guide, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

25. Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)–(10), 34 C.F.R. § 106.51(b)(1)–(10).

## Statement of Facts

26. Coach Torbett was hired in 2013 as the head coach of ECU's women's volleyball team.

27. ECU is a member of the American Athletic Conference ("AAC") and participates in NCAA Division I, the highest level of intercollegiate competition.

28. Coach Torbett has 28 years of experience as a head coach, including 26 at the helm of NCAA Division 1 programs.

29. ECU's volleyball team experienced considerable success under Coach Torbett's leadership.

30. The team won more than 10 games in each of Coach Torbett's seven seasons coaching at ECU, the first time the program had achieved seven consecutive 10+ seasons since 1989–1995.

31. In her last 4 seasons at ECU, the team recorded 69 wins, the best four-year stretch for ECU since 1979–1982.

32. Coach Torbett was ECU's winningest coach, with an overall record of 109–107, after taking over a program that was 15-101 under the previous head coach and had only 7 winning seasons in school history.

33. She has more than 450 career wins and, in 2017, ECU's volleyball program had the best record in program history.

34. Coach Torbett was selected as ECU's coach of the year for 2017.

35. In 2016, an outside consulting firm conducted a Title IX study to analyze ECU's compliance with Title IX.

36. Coach Torbett served as ECU's interim Senior Woman Administrator ("SWA") from May to December 2018. She was able to view parts of the Title audit in October 2018.

37. The consulting firm found significant violations of Title IX in terms of participation, financial aid, and treatment and benefits.

38. Despite these findings, the only meaningful step ECU took to address the non-compliance concerns was to add a women's lacrosse team starting in the 2018–2019 academic year.

39. ECU's administration at the time was planning additional actions in order to address Title IX compliance concerns; however, the administrators (Athletic Director and SWA) were abruptly removed from their position in 2018.

40. Current Athletic Director Jon Gilbert and SWA Caroline Bevillard assumed their positions at ECU in December 2018.

41. Almost immediately, Coach Torbett had concerns about AD Gilbert's and SWA Bevillard's commitment to women's athletics and gender equity in general.

42. For instance, the volleyball team received a donation in December 2018 for renovations of the team's locker rom. The renovation did not start until July 2019 (which resulted in the team having to move into a temporary space during their season) and still had not been completed when Coach Torbett was fired in March 2020.

43. Meanwhile, the men's basketball team's locker room renovation was underway within several months of the team receiving a donation.

44. The volleyball team was also forced to move out of their temporary space so the basketball team could move into it. The basketball team was back in their newly renovated locker room shortly after Christmas break.

45. The athletics department opened a "training table" (an area where athletes could get food) that was only available to football, and men's and women's basketball.

46. The table was only opened to all teams after members of Coach Torbett's team complained to administration.

47. A final straw came on September 20, 2019, when Coach Torbett earned her 100th win as ECU's head coach. After this historic feat, she received no recognition from anyone in administration. Meanwhile, just weeks earlier, AD Gilbert conducted a publicized presentation when football coach Mike Houston won his first game as head coach.

48. On or about October 7, 2019, Coach Torbett had lunch with ECU's former SWA, Rosie Thompson.

49. During the meeting, Coach Torbett described the inequitable treatment that she, female student athletes, and coaches (especially female coaches) of women's teams were receiving.

50. Ms. Thompson then called LaKesha Forbes in ECU's Office of Equity and Diversity ("OED") and asked Ms. Forbes to meet with Coach Torbett, and further requested that Ms. Forbes take steps necessary to protect Coach Torbett from retaliation for reporting Title IX concerns.

51. On or about November 5, 2019, Coach Torbett and Ms. Forbes met, at which time Coach Torbett detailed (a) the discriminatory treatment she and her team and been receiving, (b) department-wide Title IX violations, and (c) ECU's apparent use of inaccurate data when reporting female athletic opportunities to the federal government for the purpose of making ECU's participation gap look smaller than it actually was.

52. Coach Torbett also prepared and gave to Ms. Forbes a lengthy written document detailing many of the Title IX inequities she had observed. For instance, the complaint noted that

- The head coaches of four sports (only one of which was a women's team) received multi-year contracts.
- The head and assistant coaches of men's sports teams are paid more than coaches of women's teams despite years of coaching experience and level of success;
- Men's teams and male head coaches received significantly more ECU-driven publicity;
- Only football, baseball, and men's and women's basketball (approximately 145 male athletes and 15 female athletes) are permitted to charter their travel.
- Only football, baseball, men's basketball, and sometimes women's basketball are given additional benefits such as academic coordinators dedicated solely to their team, access to the most experienced strength coaches and athletic trainers, and administrative assistants.
- Double standards were applied to female coaches compared to male coaches. For instance,
  - Coach Torbett was not given permission to cut problematic players from her team, which negatively affected team culture. Meanwhile, men's teams such as basketball and baseball were permitted to cut a significant amount of players.
  - Male coaches are permitted to engage in "tough" coaching behavior (e.g., using curse words, disciplining athletes who break team rules, etc.). Coach Torbett was not permitted to discipline a player who committed a severe

8

violation of team rules and was not given general autonomy over decisions regarding punishments.

53. Coach Torbett asked that Ms. Forbes not use her name when investigating the Title IX complaint.

54. Ms. Forbes said she would try to look into the concerns in a discreet manner.

55. Less than 2 weeks later, it became apparent that other administrators had learned of Coach Torbett's complaint when she began experiencing retaliation.

56. On November 14, 2019, AD Gilbert informed Coach Torbett that if her team were to be invited to the National Invitational Volleyball Championship, they would not be permitted to go.

57. No team, at least during Coach Torbett's tenure, had ever been told they would not be allowed to attend post-season tournaments.

58. On or about November 18, 2019, Coach Torbett met with Malorie Yeaman, Director of Equal Opportunity and Title IX for OED.

59. During this meeting, Ms. Yeaman informed Coach Torbett that SWA Bevillard had inquired about whether it would be a Title IX violation to "undo" the addition of the women's lacrosse team.

60. Coach Torbett again relayed her Title IX concerns to Ms. Yeaman in a 3-hour meeting.

61. On or about January 15, 2020, Coach Torbett discovered that the compliance department had been questioning her players to see if Coach Torbett had committed any NCAA violations (she had not, and they found none).

9

62. Coach Torbett also learned that SWA Bevillard had conducted secret meetings with Coach Torbett's assistance coach and some of the volleyball players.

63. Coach Torbett further learned that SWA Bevillard promised the assistant coach that she would be named head coach if Coach Torbett was fired.

64. Now convinced that she was being retaliated against, Coach Torbett again reached out to Ms. Yeaman and Ms. Forbes.

65. Over the next several weeks, Coach Torbett had numerous conversations with Ms. Yeaman, Ms. Martin, members of ECU's Human Resources department, and Sue Martin (Equal Employment Opportunity Investigator) detailing the retaliation and discriminatory treatment she was experiencing.

66. Additionally, she noted that SWA Bevillard was creating animosity for Coach Torbett amongst her players and interfering with Coach Torbett's ability to lead her team.

67. Coach Torbett also retained legal counsel.

68. Due to the rumors that Coach Bevillard, the assistant coach, and some members of the team were working together ensure Coach Torbett's termination, Coach Torbett's legal counsel sent a letter to ECU on January 22, 2020, explaining that female coaches are at a high risk of receiving complaints from their student athletes.

69. The correspondence explained that female coaches experience this heightened risk due to gender stereotypes.

70. Specifically, Coach Torbett's legal counsel explained that behaviors generally associated with good coaching (e.g., motivating players, making difficult decisions about who gets playing time, pushing athletes to perform at their highest level) are accepted when engaged in by males.

71. Conversely, women who engage in these behaviors are perceived as "bullying" because these behaviors are inconsistent with stereotypical notions about how women are "supposed to" behave—i.e. as caregiver and nurturer.

72. Through the rest of January and the beginning of March 2020, Coach Torbett met on numerous occasions with ECU representatives, all the while thinking that ECU was investigating her Title IX and retaliation complaints.

73. On March 23, 2020, Coach Torbett sent AD Gilbert a text notifying him that her husband was severely ill with Covid-19, requiring emergency hospitalization.

74. On March 25, 2020, AD Gilbert called Coach Torbett in for a meeting and fired her, claiming it was due to a finding that she had created a "toxic culture" on her team.

75. On March 31, 2020, ECU issued a report, authored by Ms. Forbes and Chief Audit Officer Wayne Poole titled "Review of Allegations and Concerns Made by and about the Women's Volleyball Program.

76. The report identified 29 areas that were investigated. Of those, 16 of those issues were raised by Coach Torbett or her legal counsel, 6 were raised by student athletes and/or parents and were issues regarding mistreatment by ECU administration (i.e., not Coach Torbett), and 5 were raised by student athletes and/or parents regarding allegations against Coach Torbett.

77. None of the concerns raised by Coach Torbett or her legal counsel were deemed substantiated.

78. None of the concerns about mistreatment by ECU administration were deemed substantiated.

79. Three of the 5 allegations against Coach Torbett were deemed substantiated.

80. The allegations against Coach Torbett were that she created a toxic environment, was abusive, intimidated players, and was inconsistent in how she handled violations of team rules.

81. The report "confirmed" the allegations of "toxic culture, lack of trust and honesty within the program, manipulation" and a perception that team rule violations were not handled in a consistent manner.

82. These allegations were exactly the type of gender-based allegations that Coach Torbett's legal counsel warned ECU about in the January 22, 2020 correspondence.

83. ECU knew or should have known that Coach Torbett did not engage in any behavior that could objectively substantiate any claims of abuse, bullying, or intimidation.

84. ECU knew or should have known, based on the actions of SWA Bevillard and AD Gilbert in soliciting complaints from student athletes, that the allegations against Coach Torbett were false.

85. ECU knew that any culture issues within the volleyball program were the result of SWA Bevillard's retaliatory actions in terms of causing discontent amongst certain members of the team and not permitting Coach Torbett to make autonomous decisions about punishments for team rule violations.

86. ECU has not disciplined, let alone fired, any male coach for engaging in behavior that was similar to or objectively harsher than Coach Torbett's.

87. ECU knows these male coaches engage in harsher behavior such as swearing at players, imposing physical punishments for rule violations, and cutting large numbers of players from their rosters.

88. For instance, due to the known excessive foul language used by the men's basketball coach, the entire fan section behind the bench was moved to another location so fans could not hear him.

89. This coach was also permitted to cut large numbers of players from roster without interference from administration. To the contrary, administration drastically increased his recruiting budget so he could replace the players he cut.

90. After taking over the program in 2018, he told the players that the previous coach gave up a million just so he did not have to coach their "sorry asses."

91. The coach was fired in March 2022 only because of his poor winning record, not because of treatment of student athletes.

92. AD Gilbert's public statements regarding the coach's firing were all positive.

93. In contrast, he gave no positive public statements about Coach Torbett despite her success and long-time service at ECU.

94. ECU hired a significantly less qualified male to replace Coach Torbett.

95. At the time of his hiring, the new volleyball coach had only 1 year of head coaching experience at the collegiate level, compared to Coach Torbett's 25+ years.

96. In May 2020, ECA announced its decision to eliminate 4 teams: men's and women's swimming and men's and women's tennis.

97. With that elimination, female athletes at ECU received only 50.49% of the athletic opportunities available at ECU while they comprised 56.57% of the undergraduate enrollment, putting them even further out of compliance with Title IX's equitable participation requirement.

98. In December 2020, ECU entered into a public settlement with members of women's swimming and women's tennis team, under which ECU agreed to reinstate the teams and develop a gender equity plan to set forth terms for how ECU will comply Title IX going forward.

**FIRST CAUSE OF ACTION**
**Violations of Title IX**
**(Gender Discrimination & Retaliation)**

99. Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

100. Defendant's educational programs and activities receive federal financial assistance within the meaning of Title IX.

101. Title IX regulations require Defendant to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

102. Under the provisions of Title IX, it is unlawful for an employer to discriminate against an employee on the basis of sex and to retaliate against an employee for engaging in protected activity.

103. Coach Torbett was denied the benefit of and subjected to discrimination in the Defendant's education programs.

104. Coach Torbett's denial of benefits and subjection to discrimination were based on her sex.

105. Defendant violated Coach Torbett's rights under Title IX by:

   a. Holding her to a different and higher standard than her male counterparts;

   b. Retaliating against her after she raised concerns about ECU's Title IX violations;

   c. By firing her.

106. When Coach Torbett complained about discriminatory treatment of female student athletes through ECU's violations of Title IX, she was retaliated against by ECU administrators.

107. Defendant violated Coach Torbett's rights, and the rights of ECU's female student athletes, when Coach Torbett was investigated and fired in retaliation for her complaints regarding ECU's Title IX violations.

108. Defendant violated Title IX's prohibition of gender discrimination when it fired Coach Torbett purportedly for student athlete complaints while not disciplining, let alone firing, male coaches who actually engage in harsh coaching behavior.

109. Title IX incorporates the anti-retaliation provisions of Title VI of the Civil Rights Act of 1964. 34 C.F.R. § 106.71 (incorporating the retaliation language of the regulations under Title VI [34 C.F.R. § 100.79(e)]).

110. As a result of Defendant's actions, Coach Torbett has in the past and will in the future suffer injuries and damages, including but not limited to, loss of employment, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

111. As a result of Defendant's actions, Coach Torbett seeks monetary damages, including but not limited to, economic and career loss damages for the indignity and humiliation of being retaliated against.

112. Defendant's actions also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title IX, including but not limited to:

    a. Plaintiff's reinstatement to her position as head coach;

b. A court order requiring Defendant be audited regarding its compliance with Title IX and that any failures or violations of Title IX be immediately remedied by ECU;

c. Defendant be required to take steps to not only comply with Title IX, but to also provide additional remedies and funding to make up for shortcomings and the failure to make progress as required by Title IX;

d. Training on the removal of implicit bias and gender stereotypes form the assessment of female coaches and women's athletic programs; and

e. Such other and further relief under Title IX as needed to make Coach Torbett and other females similarly situated whole.

## Prayer for Relief

WHEREFORE, Plaintiff Julie Torbett requests judgment against Defendant in an amount that will fully and fairly compensate her for her injuries and damages; reinstatement; compensatory damages for loss of employment, emotional pain and suffering, indignity, humiliation, embarrassment, inconvenience, damage to her reputation, out-of-pocket expenses; equitable relief; and any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of Title IX; prejudgment and post-judgement interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## Jury Demand

COMES NOW, Plaintiff Julie Torbett, and hereby requests a trial by jury in the above-captioned matter.

This, the 25th day of March, 2022.

        */s/ Thomas Newkirk*
Thomas Newkirk, *Pro Hac Vice Pending*
tnewkirk@newkirklaw.com
Danya Keller, *Pro Hac Vice Pending*
dkeller@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
521 East Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004

*/s/Jonathan Wall*
Jonathan Wall
HIGGINS BENJAMIN, PLLC
301 N. Elm Street, Suite 800
Greensboro, NC  27401
336-273-1600
jwall@greensborolaw.com
Local Civil Rule 83.1(d) Counsel for Plaintiff

ATTORNEYS FOR PLAINTIFF